# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

RESCAP LIQUIDATING TRUST,

        Plaintiff,

v.

FIRST TENNESSEE BANK, N.A.,

        Defendant.

Court File No. 17- CV-194

**COMPLAINT**

---

Plaintiff ResCap Liquidating Trust ("Trust" or "Plaintiff"), by and through its attorneys, and as successor to Residential Funding Company, LLC (formerly known as Residential Funding Corporation) ("RFC"), alleges for its Complaint against Defendant First Tennessee Bank National Association ("First Tennessee" or "Defendant"), both in its own capacity and as successor to First Horizon Home Loan Corporation and certain of its predecessor entities (as described in more detail in paragraph 16 below), as follows:

<u>NATURE OF ACTION</u>

1.     This action concerns defective residential mortgage loans that Defendant sold to RFC.

2.     As alleged in further detail below, Exhibit A identifies, on a loan-by-loan basis, specific contractual breaches in 278 loans Defendant sold to RFC that were identified by performing an Automated Valuation Model ("AVM") analysis on these loans (the analysis is discussed further below). The loans with defects represent 31.9% of the analyzed loans.

3.     The defective loans that Defendant sold to RFC eventually contributed to numerous lawsuits being filed against RFC.  These lawsuits were one of the factors that ultimately led to RFC filing for bankruptcy.  The defective loans that Defendant sold to RFC also contributed to numerous proofs of claim being filed against RFC in its bankruptcy.  Sizeable sums have been paid out under RFC's confirmed chapter 11 plan based on these proofs of claim.

4.     RFC incurred massive liabilities and losses by virtue of the foregoing and other breaches, including as a result of settlements in RFC's chapter 11 case, which is part of the jointly administered chapter 11 cases pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under the caption, *In re Residential Capital, LLC, et al.*, Case No. 12-12020 (MG).  Defendant is legally and contractually responsible for the liabilities and losses caused by the poor quality of the mortgage loans in question.

5.     At all relevant times prior to its bankruptcy in May 2012, RFC was in the business of acquiring and securitizing residential mortgage loans.  RFC's business model was built on acquiring residential mortgage loans from "correspondent lenders," such as Defendant, and distributing those loans by either pooling them together with other similar mortgage loans to sell into residential mortgage-backed securitization ("RMBS") trusts, or selling them to whole loan purchasers.

6.     Over the course of the parties' relationship, Defendant sold over 14,400 mortgage loans to RFC, with an original principal balance in excess of $943 million which were included in RMBS trusts for which liabilities were settled in the bankruptcy.

As alleged in greater detail below, numerous loans Defendant sold to RFC were defective.

7.      Critical to RFC's business success was the quality of the loans it purchased. To that end, RFC required its correspondent lenders, including Defendant, to abide by stringent loan-level contractual representations and warranties designed to protect RFC from the risks of borrower fraud, appraisal fraud, failure to comply with state and federal law, and other credit and compliance factors that could negatively impact the performance and value of the loans it purchased.

8.      During the course of RFC's business relationship with Defendant, RFC from time to time identified loans that contained material defects violating one or more of Defendant's contractual representations and warranties.  Defendant, in turn, acknowledged those material defects by repurchasing the loans or otherwise compensating RFC for the defects.  To the extent Defendant repurchased certain individual loans from RFC, RFC is not seeking to again recover the repurchase price as to those loans.  However, Defendant's repurchase of certain loans did not compensate RFC for all the liabilities and losses that RFC incurred due to Defendant's sale of defective loans to RFC.  The parties' Agreement (as such term is defined below) entitles RFC to recovery for the additional liabilities and losses it incurred due to Defendant's breaches.

9.      Ultimately, due in significant part to the failure of correspondent lenders, including Defendant, to honor their contractual representations and warranties to RFC, RFC was sued by numerous counterparties and investors in its RMBS, based on

allegations that the loans contained multiple defects and were rife with fraud and compliance problems.

10.     By the time RFC and certain of its affiliates (collectively, the "Debtors") filed for bankruptcy in May 2012, RFC was already facing over two dozen lawsuits around the country, all alleging that the loans RFC had securitized were defective, as well as demands by investors in hundreds of its RMBS, seeking tens of billions of dollars in damages based on loan-level problems.

11.     Subsequently, during the bankruptcy, hundreds of proofs of claim were filed against RFC and its affiliates by dozens of claimants, including investors alleging securities fraud claims, class action plaintiffs, monoline insurers, RMBS holders and indenture trustees acting at their direction claiming breaches of representations and warranties, whole loan investors, and non-debtor co-defendants (such as underwriters of the RMBS offerings). Collectively, these claims alleged tens of billions of dollars of damages stemming from defective loans, including loans sold to RFC by Defendant.

12.     Following a lengthy and intensive mediation presided over by then-sitting bankruptcy judge James M. Peck, and related proceedings, RFC was able to resolve its RMBS-related liabilities for over $10 billion of allowed claims. This agreed resolution of RFC's RMBS-related liabilities was set forth in a global settlement, which formed the cornerstone of a liquidating chapter 11 plan for RFC and its affiliated Debtors. On December 11, 2013, after a five-day confirmation trial, the Bankruptcy Court approved the global settlement, finding it to be fair and reasonable and in the best interests of each of the Debtors, and confirmed the *Second Amended Joint Chapter 11 Plan Proposed by*

*Residential Capital LLC, et al. and the Official Committee of Unsecured Creditors*, Case No. 12-12020 (MG) (Bankr. S.D.N.Y.) [D.I. 6065-1] (the "Plan"). Under paragraphs 24 and 48 of the *Order Confirming Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors*, Case No. 12-12020 (MG) (Bankr. S.D.N.Y.) [D.I. 6065], and Article IV of the Plan, the Trust is responsible for monetizing many of the Debtors' remaining assets and pursuing litigation— including with respect to RFC's rights against Defendant and other parties who sold mortgages to RFC—and distributing the proceeds to the Debtor's creditors.

13. Defendant is contractually obligated to indemnify the Trust, as successor to RFC's rights under the Plan, for all liabilities and losses incurred by the Trust or RFC as a result of breaches of Defendant's representations and warranties.

14. Accordingly, the Trust brings this action for breach of contract, and for indemnification of all liabilities and losses RFC and the Trust has incurred due to breaches by Defendant of its representations and warranties.

## PARTIES

15. Plaintiff ResCap Liquidating Trust is a Delaware Statutory Trust created pursuant to the Plan. RFC is a Delaware limited liability company. When it filed for bankruptcy, RFC was a Delaware limited liability company with its principal place of business in Minneapolis, Minnesota. RFC was formerly known as Residential Funding Corporation. At the time it filed for bankruptcy, RFC was a wholly-owned subsidiary of GMAC-RFC Holding Company, LLC, a Delaware limited liability company. GMAC-RFC Holding Company, LLC was in turn a wholly-owned subsidiary of Residential

Capital, LLC, a Delaware limited liability company. Residential Capital, LLC was a wholly-owned subsidiary of GMAC Mortgage Group, LLC, a Delaware limited liability company, which in turn was a wholly-owned subsidiary of Ally Financial, Inc., a Delaware corporation with its principal place of business in Michigan. Pursuant to the Plan, on December 17, 2013, GMAC-RFC Holding Company's interest in RFC was cancelled and, in accordance with the Plan's terms, the Trust has now succeeded to all of RFC's rights and interests under RFC's Agreement with Defendant.

16. Defendant First Tennessee Bank National Association is a national bank with its principal place of business at 165 Madison Avenue, Memphis, Tennessee 38101. Defendant First Tennesse is the successor by merger to First Tennessee Mortgage Services, Inc. Defendant First Tennessee merged with First Horizon Home Loan Corporation in 2000. First Horizon Home Loan Corporation was successor by a series of mergers to Carl I. Brown & Company, Maryland National Mortgage Corporation ("MNC"), Atlantic Coast Mortgage, Sunbelt National Mortgage, FT Mortgage Companies, HomeBanc FSB, Homebanc Mortgage Corporation, and Elliot Ames, Inc. First Horizon Home Loan Corporation also purchased the mortgage operations of the Equity Group Financial, Inc. and is a successor to that entity. All of these entities sold loans to RFC. From time-to-time, First Horizon Home Loan Corporation would continue to use the names of these businesses as trade names or fictitious names even after it merged with these entities.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, in that the matter arises under title 11 or arises in or is related to the Debtors' bankruptcy proceedings. This Court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, in that the parties are citizens of different states and the amount in controversy exceeds $75,000.

18.     Venue is proper in this Court because the causes of action arose, in part, in Minnesota, the agreements at issue were to be performed in part or entirely in Minnesota, and the parties have contractually agreed in certain of these contracts that courts located in Minnesota are an appropriate forum.

## FACTUAL BACKGROUND

### The Agreement Between RFC and Defendant.

19.     Over the course of the parties' relationship, Defendant sold over 14,400 mortgage loans to RFC, pursuant to the Seller Contracts attached as Exhibit B (together, the "Contract"), which were then securitized into RMBS trusts for which liabilities were settled in the bankruptcy

20.     Most of the Seller Contracts incorporate RFC's standard terms and conditions for purchasing loans, frequently called the Client Guide (the "Client Guide").[1] A complete copy of the March 13, 2006 edition of the Client Guide is attached hereto as Exhibit C-1, and exemplary excerpts of other editions of the Client Guide are attached as

---

[1] One exception is the Mortgage Loan Purchase and Sale Agreement (the "MLPSA") dated as of June 1, 2007, between RFC and First Tennessee National Association, which is included in the seller contracts attached hereto as Exhibit B.

Exhibits C-20 through C-44 and C-46 through C-49. The complete versions of other editions are known to the parties and too voluminous to attach in their entirety. The provisions of the Client Guide relevant to Plaintiff's claims were substantially similar during all periods relevant to this Complaint. Prior to the release of the Client Guide, RFC sold loans under two different guides: the AlterNet Seller Guide and the RFC Seller Guide ("Seller Guide"). Defendant sold RFC loans under the Seller Guide. A copy of the September 16, 1996 Seller Guide is attached hereto as Exhibit C-18.[2] The Contract, Client Guide, and Seller Guide collectively form the parties' agreement (the "Agreement"), and set the standards to which the loans sold by Defendant to RFC were required to adhere.

21.     A list of loans sold by Defendant to RFC pursuant to the Agreement, and subsequently securitized by RFC, is attached hereto as Exhibit D. The original principal balance of these loans in aggregate exceeds $943 million.

22.     As a correspondent lender, Defendant had the initial responsibility for collecting information from the borrower, verifying its accuracy, and underwriting the loan. Defendant had primary responsibility for all aspects of the underwriting of the loan, and it was understood between the parties that RFC would generally *not* be re-underwriting the loan prior to purchase. It was Defendant, or others from whom Defendant purchased mortgages, that actually closed the loans with the borrowers.

---

[2] Like with the Client Guide, all applicable versions of the Seller Guide are too voluminous to attach in their entirety. Therefore, exemplary excerpts of Seller Guide additions other than the September 16, 1996 Seller Guide are attached as Exhibits C-2 through C-17 and C-19.

Accordingly, Defendant knew or should have known of the defects in the loans it sold to RFC. In addition, under the Client Guide, Defendant was obligated to audit "at least a 10% randomly selected sample of recently closed Loan inventory sold to GMAC-RFC and review the product within 90 days of its origination…" (Client Guide § A210(2).)[3]

23.     Indeed, the Client Guide expressly adopts a broad definition of "knowledge," which includes constructive knowledge, and states that "any representation or warranty that is inaccurate or incomplete in any material respect is presumed to be made with the knowledge of [Defendant], unless [Defendant] demonstrates otherwise…." (Client Guide § 103(A).)   Defendant has a continuing obligation under Section A201(M) of the Client Guide to promptly notify RFC of any act or omission which might impact the Loan, the Mortgaged Property, or the Mortgagor (as such terms are defined in the Client Guide).   Defendant has continually breached this obligation, including through to the present, by failing to inform RFC of defects in the loans it sold to RFC.

24.     As Defendant was well aware, once the loans were sold to RFC, RFC in many instances pooled groups of loans with similar characteristics, and the pool of loans would be sold into a special-purpose securitization trust.   The pool of loans formed the collateral underlying the trust's mortgage-backed securities, which were in turn sold to investors.

25.     Defendant knew of RFC's intention to securitize the loans.   Specifically, in the Client Guide,  Defendant "recognize[d] that it is [RFC's] intent to securitize some or

_____

[3] Defendant "must select for audit at least 10% of recently closed inventory sold to Residential Funding and should review the product within ninety (90) days of its origination."  (Seller Guide 233(2).)

all of the Loans sold to [RFC]," and agreed to provide RFC with "all such information …

as may be reasonably requested by [RFC] for inclusion in a prospectus or private

placement memorandum published in connection with such securitization," including all

information necessary to comply with the disclosures required by Regulation AB

(governing asset-backed securities) and other applicable federal securities laws.  (*See*

Client Guide A202(JJ); 206(D).)

26.     Pursuant to the Agreement, Defendant made a number of representations

and warranties with respect to all of the loans it sold to RFC, including, but not limited to,

the following:

> a.  Defendant's "origination and servicing of the Loans have been legal, proper, prudent and customary and have conformed to the highest standards of the residential mortgage origination and servicing business."  (Client Guide A201(K).)
>
> b.  Defendant "will comply with all provisions of this Client Guide and the Program Documents, and will promptly notify [RFC] of any occurrence, act, or omission regarding [Defendant], the Loan, the Mortgaged Property or the Mortgagor of which [Defendant] has knowledge, which … may materially affect [Defendant], the Loan, the Mortgaged Property or the Mortgagor."  (Client Guide A201(M).)
>
> c.  "All information relating to each Loan delivered and sold to [RFC] is true, complete and accurate and there are no omissions of material facts. All data provided by the [Defendant] to [RFC] relating to any Loan, whether in electronic format, or otherwise, is true and complete and accurately reflects the information in the related Loan file."  (Client Guide A202(A).)[4]

---

[4] "All documents and information (tangible written form, electronic, imaged, or otherwise) delivered by [Defendant] to RFC under or in connection with this Agreement are true, correct and complete in all material respects."  (MLPSA 3.1(m).)  "The information set forth in the Mortgage Loan Schedule is true and correct in all material respects."  (MLPSA 3.3(a).)

d. "All Loan Documents, Funding Documents and Final Documents are genuine, have been completed, duly and properly executed, are in recordable form and delivered in the form and manner specified in this Client Guide," and "[a]ll originals and copies of such documents and all other documents, materials, and other information required to be submitted to [RFC] have been so submitted, and are complete and accurate." (Client Guide A202(D).)[5,6]

e. "All Loan Documents, Funding Documents and Final Documents and all other documents describing or otherwise relating thereto are in compliance with all local and State laws, regulations and orders." (Client Guide A202(D).)[7,8]

f. "There is no default, breach, violation or event of acceleration existing under any Note or Security Instrument transferred to [RFC], and no event exists which, with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration, and no such default, breach, violation or event of acceleration has been waived by [Defendant] or any other entity involved in originating or servicing the Loan." (Client Guide A202(G).)[9,10]

---

[5] "The Mortgage Note and the related Mortgage are original and genuine and each is the legal, valid and binding obligation of the maker thereof enforceable in all respects . . . ." (MLPSA 3.3(x).)

[6] "All Loan Documents, Funding Documents, and Final Documents have been completed, duly and properly executed, and delivered in the form and manner specified in this Seller Guide, and all originals and copies of such documents and all other documents, and other information required to be submitted to [RFC] have been so submitted and are complete and accurate." (Seller Guide 251(d).)

[7] "Any and all requirements of any applicable federal, state or local law including, without limitation, usury, truth in lending, real estate settlement procedures, consumer credit protection, equal credit opportunity, disclosure laws, and Electronic Transaction Laws have been complied with, and the consummation of the transactions contemplated hereby will not involve the violation of any such laws or regulations." (MLPSA 3.03(k).)

[8] "All Loan Documents, Funding Documents, Final Documents and all other documents describing or otherwise relating thereto are in compliance with all applicable local and State laws, regulations and orders." (Seller Guide 251(d).)

[9] "There is no default, breach, violation or event of acceleration existing under the Mortgage or the related Mortgage Note and, to the best of [Defendant]'s knowledge, there is no event that, with the passage of time or with notice and the expiration of any

g. "[E]ach Loan has been originated, closed, and transferred in compliance with all applicable local, State and federal laws and regulations, including, but not limited to, the Real Estate Settlement Procedures Act, the Fair Credit Reporting Act, the Equal Credit Opportunity Act, the Truth-in-Lending Act, the Fair Housing Act, and the National Flood Insurance Act. This warranty is made by [Defendant] with respect to each [RFC] Loan Application taken and processed for each Loan and with respect to each Loan made by the [Defendant] or any other entity." (Client Guide A202(I).)

h. "No Loan is a … loan considered a 'high-cost,' covered, 'high-risk,' 'predatory' or any other similar designation under any State or local law in effect at the time of the closing of the loan if the law imposes greater restrictions or additional legal liability for residential mortgage loans with high interest rates, points and/or fees." (Client Guide A202(J)(1)(d).)[11,12]

i. "[N]o circumstances exist involving the Loan Documents, the Mortgaged Premises or the Borrower's credit standing that could: (i) cause private institutional investors to regard the Loan as an

---

grace or cure period, would constitute a default, breach, violation or event permitting acceleration." (MLPSA 3.03(f).)

[10] "There is no default, breach, violation or event of acceleration existing under any Note or Security Instrument transferred to [RFC] and no event exists which, with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration, and no such default, breach, violation or event of acceleration has been waived by the [Defendant] or by any other entity involved in originating or serving the Loan." (Seller Guide 251(g).)

[11] "No Mortgage Loan is a 'high cost,' 'covered,' 'high risk home' or 'predatory' mortgage loan under applicable federal, state or local law in effect at the time of origination of such Mortgage Loan, or a mortgage loan of any other similar designation if applicable federal, state or local law imposes greater restriction, heightened regulatory scrutiny or additional legal liability as a result of such Mortgage Loan having a high interest rate, points and/or fees." (MLPSA 3.03(z).)

[12] "For "high cost," "high fee" Loans as defined in Regulation Z, Section 226.32 (Section 32 Mortgages), the [Defendant] specifically warrants that all Section 32 Mortgages have been accurately identified, that accurate disclosures have been provided to the consumer and to [RFC] in accordance with Regulation Z, that the Section 32 Mortgages do not contain any prohibited terms as specified in Regulation Z, Section 226.32(d) and that the [Defendant] has not engaged in any prohibited acts and practices as specified in Regulation Z, Section 226.32(e). (Seller Guide 251(i).)

unacceptable investment, (ii) cause the Loan to become delinquent, or (iii) adversely affect the Value or marketability of the Mortgaged Premises or the Loan." (Client Guide A202(Q).)[13]

j. "The Loan is of investment quality, has been prudently originated and has been underwritten in compliance with all requirements of this Client Guide." (Client Guide A202(T).)[14,15]

k. "For each Loan for which an appraisal is required or obtained under this Client Guide, the appraisal was made by an appraiser who meets the minimum qualifications for appraisers as specified in this Client Guide." (Client Guide A202(T).)[16,17]

l. "For each Loan, as of the Funding Date, the market Value of the Mortgaged Premises is at least equal to the appraised value stated on the Loan appraisal, or if an Automated Valuation Model (AVM) is permitted, the Value on the AVM, except to the extent that the market Value of the Mortgaged Premises is lower … due to the effect of any toxic materials or other environmental hazards of which neither the

---

[13] "[N]o circumstances exist involving the Loan Documents, the Mortgaged Premises or the Borrower's credit standing that could: (i) cause private institutional investors to regard the Loan as an unacceptable investment, (ii) cause the Loan to become delinquent, or (iii) adversely affect the Value or marketability of the Mortgaged Premises or the Loan." (Seller Guide 251(p).)

[14] "The origination and servicing practices used by Seller and any other originator and servicer with respect to each Mortgage Loan have been in all respects legal, proper, prudent and customary in the mortgage service industry, and private institutional lenders would have no reason to regard the Mortgage Loan as an unacceptable investment." (MLPSA 3.03(ww).)

[15] "The Loan is of investment quality, has been prudently originated and has been underwritten in compliance with all requirements of this Seller Guide." (Seller Guide 251(s).)

[16] "The Mortgage File for each First Lien Mortgage Loan contains an appraisal of the related Mortgaged Property, signed prior to the final approval of the mortgage loan application by a Qualified Appraiser, and the appraisal and appraiser both satisfy the requirements of Fannie Mae or Freddie Mac and Title XI of FIRREA and the regulations promulgated thereunder, all as in effect on the date the Mortgage Loan was originated." (MLPSA 3.03(t).)

[17] "The appraisal was made by an appraiser who meets the minimum qualifications for appraisers as specified in this Seller Guide." (Seller Guide 251(s).)

appraiser nor the [Defendant] has actual knowledge or reasonable grounds to suspect." (Client Guide A202(T).)[18]

m. "No fraud or misrepresentation by the Borrower or by the [Defendant], broker, correspondent, appraiser or any independent contractor retained by the [Defendant], broker, correspondent, appraiser or any employee of any of the foregoing occurred with respect to or in connection with the origination or underwriting of any Loan and all information and documents provided to [RFC] in connection with the Loan are complete and accurate." (Client Guide A202(KK).)[19]

27. These representations and warranties were material terms in RFC's agreement to acquire the mortgage loans from Defendant. Defendant's contractual warranty of the quality of the loans was important because RFC in turn sold these loans to RMBS trusts and whole loan purchasers, making its own representations and warranties to the trusts and investors about the quality of loans that were based on warranties received from Defendant. If any of Defendant's representations and warranties turned out to be false, RFC could have exposure to these third parties, and thus RFC required contractual protection from Defendant under which RFC would have recourse for its liabilities and losses on account of defective loans.

28. Pursuant to the Client Guide, a correspondent's failure to comply with its representations and warranties, or <u>any</u> of the other requirements, terms, or conditions of

---

[18] "The market value of the Mortgaged Premises is at least equal to the appraised value stated on the Loan except to the extent that the market value of the Mortgaged Premises is lower than the appraised value due to the effect of any toxic materials or other environmental hazards of which neither the appraiser nor the seller has actual knowledge or reasonable grounds to suspect." (Seller Guide 251(s).)

[19] "No error, omission, misrepresentation or fraud in respect of such Mortgage Loan has taken place on the part of any Person in connection with the origination and servicing of such Mortgage Loan and all information provided by Seller to Purchaser is true, correct and complete in all material respects." (MLPSA 3.03(tt).)

the Client Guide, constitutes an "Event of Default," as does its failure to provide RFC with true, accurate, and complete information in a timely manner. (*See* Client Guide A208.)

29.     Similarly, it is an "Event of Default" if a "[b]orrower or any other person or entity involved in the Loan transaction or its underwriting or documentation (including any appraiser, broker, third-party originator, credit reporting agency, or other provider of underwriting information) has made any false representation and/or has failed to provide information that is true, complete and accurate in connection with" the loan transaction, regardless of whether Defendant knew of the misrepresentation or incorrect information. (*See* Client Guide A208.)

30.     Defendant expressly agreed that RFC was permitted to exercise any remedy "allowed by law or in equity" in connection with such Events of Default. (*See* Client Guide A209(A).) Moreover, the Client Guide specified that RFC's "exercise of one or more remedies in connection with a particular Event of Default will not prevent it from exercising … [o]ne or more other remedies in connection with the same Event of Default," or "[a]ny other rights which it may have at law or in equity." (Client Guide A209(A).) Defendant also agreed that it was "liable for any misrepresentation or breach of warranty regardless of whether it or [RFC] actually had, or reasonably could have been expected to obtain, knowledge of the facts giving rise to such misrepresentation or breach of warranty." (Client Guide A200.) RFC's remedies expressly survived the sale of the loans and the termination of the ongoing business relationship between RFC and Defendant. (*See* Client Guide A209(C).)

31.     The Client Guide further specified certain remedies available to RFC in case of an Event of Default, including a breach of any loan-level representation or warranty.  The available remedies included, but were expressly not limited to, repurchase of the defective loan, substitution of another loan for the defective one, or indemnification against liabilities resulting from such breaches.  (*See* Client Guide A210 and MLPSA 3.4 and 4.1.)  Further indemnification remedies are set forth in Sections A202 and A212 of the Client Guide.  Section A209 of the Client Guide, in turn, makes clear that all of these remedies are non-exclusive and cumulative.

32.     Moreover, RFC alone retained the sole discretion to declare an Event of Default, and to choose which remedy or remedies to pursue.  Nothing in the Agreement required RFC to provide Defendant with notice and an opportunity to cure the defects or make a repurchase demand, or in any way restricted RFC from pursuing recovery for defective loans at any time.  In fact, the United States Court of Appeals for the Eighth Circuit recently confirmed that, under the Client Guide, RFC has the sole discretion to declare an Event of Default, and correspondent lenders such, as Defendant, have contractually bargained away any right to challenge RFC's determination regarding such an Event of Default.  *See Residential Funding Co., LLC v. Terrace Mortg. Co.*, 725 F.3d 910 (8th Cir. 2013).

33.     One nonexclusive provision of the Client Guide permits RFC to recover for defective loans according to formulas based on the original principal balance of the loan.  (*See* Client Guide A210(B) (First Mortgage Programs) and Client Guide A210(C) (Home Equity Program).)  If RFC determined that application of the applicable contractual

repurchase price formula was not appropriate, Defendant would nonetheless be contractually obligated to pay RFC "all losses, costs and expenses incurred by [RFC] and/or the Loan's Servicer as a result of an Event of Default," including "all reasonable attorneys' fees and other costs and expenses incurred in connection with enforcement efforts undertaken." (*See* Client Guide A210(A).)

34.     Under the terms of the Agreement, Defendant is obligated to repurchase loans and/or pay RFC the repurchase price even if the loan has already been foreclosed upon. (*See* Client Guide A210(B).)

35.     Defendant also expressly agreed to broad indemnification provisions, including the following:

> [Defendant] shall indemnify [RFC] from all losses, damages, penalties, fines, forfeitures, court costs and reasonable attorneys' fees, judgments, and any other costs, fees and expenses … includ[ing], without limitation, liabilities arising from (i) any act or failure to act, (ii) any breach of warranty, obligation or representation contained in the Client Contract, (iii) any claim, demand, defense or assertion against or involving [RFC] based on or resulting from such breach, (iv) any breach of any representation, warranty or obligation made by [RFC] in reliance upon any warranty, obligation or representation made by [Defendant] contained in the Client Contract and (v) any untrue statement of a material fact, omission to state a material fact, or false or misleading information provided by the [Defendant] in information required under Regulation AB or any successor regulation.

> In addition, [Defendant] shall indemnify [RFC] against any and all losses, damages, penalties, fines, forfeitures, judgments, and any other costs, fees and expenses (including court costs and reasonable attorneys' fees) incurred by [RFC] in connection with any litigation or governmental proceeding that alleges any violation of local, State or federal law by [Defendant], or any of its agents, or any originator or broker in connection with the origination or servicing of a Loan.

(Client Guide A212.)  Defendant further agreed:

> to indemnify and hold [RFC] harmless from and against any loss, damage, penalty, fine, forfeiture, court cost, reasonable attorneys' fees, judgment, cost, fee, expense or liability incurred by [RFC] as a result of any material misstatement in or omission from any information provided by [Defendant] to [RFC]; or from any claim, demand, defense or assertion against or involving [RFC] based on or grounded upon, or resulting from such misstatement or omission or a breach of any representation, warranty or obligation made by [RFC] in reliance upon such misstatement or omission.

(Client Guide A202(II).)  The Client Guide also entitles RFC to recover all court costs, attorneys' fees and any other costs, fees and expenses incurred by RFC in enforcing the Agreement.  (Client Guide A212.)[20,21]

---

[20] Under the MLPSA, Defendant agreed:

> to indemnify [RFC] and its affiliates and hold them harmless against any and all claims, losses, damages, penalties, fines, forfeitures, legal fees and related costs, judgments, and any other costs, fees and expenses that [RFC] or any of its affiliates may sustain in any way related to or resulting from (i) any claim, demand, defense or assertion based on or grounded upon or resulting from, or alleging a breach of a representation or warranty set forth in Sections 3.1 and 3.3 of this Agreement, and without regard to any knowledge qualifier included in any such representation or warranty, (ii) a breach by [Defendant] of any of its duties or obligations under this Agreement ….

(MLPSA 4.1(a).)

[21] Under the Seller Guide Defendant:

> shall indemnify [RFC] from and hold it harmless against all losses, damages, penalties, fines, forfeitures, court costs and reasonable attorneys' fees, judgments, and any other costs, fees, and expenses resulting from any Event of Seller Default, including but not limited to any act or failure to act or any breach of any warrant, obligation or representation contained in or made pursuant to the Seller/Servicer Contract, or from any claim, demand, defense or assertion against or involving [RFC] based on or grounded upon, or resulting from such breach or a breach of any representation, warranty or obligation made by [RFC] in reliance upon any warranty, obligation or representation made by the [Defendant] contained in or made pursuant to the Seller/Servicer Contract ….

18

36.     Additionally, prior to the commencement of this lawsuit, Defendant previously conceded that certain of the loans it sold to RFC were materially defective, and has already paid substantial sums to RFC to cover those defects.  In this action, Plaintiff is not seeking to recover again on those sums.  However, Defendant's practice of repurchasing and/or making RFC whole for defective loans demonstrates that it was aware that it had problems with its underwriting of loans it sold to RFC, but failed to comply with its ongoing obligation under Section A201(M) of the Client Guide to notify RFC of problems with other loans.

37.     RFC at all times performed all of its obligations to Defendant, if any, under the Agreement, and all conditions precedent to the relief sought in this action, if any, have been satisfied.

**Defendant Materially Breached Numerous Loan-Level Representations and Warranties.**

38.     As noted above, the loans RFC acquired from Defendant and other correspondent lenders were in many instances sold into RMBS trusts that issued certificates to outside investors.

39.     Some of the loans that Defendant sold to RFC were eventually deposited in 175 RMBS trusts.  When RFC sold the loans into the trusts, it made representations and warranties to the trusts, and, as required by SEC regulations, disclosed pertinent information about the loans to investors in the RMBS.  In making those representations and warranties, RFC relied on information provided to it by Defendant and other

(Seller Guide 273.)

correspondent lenders. In many cases, the information Defendant provided violated its representations and warranties to RFC.

40. Defendant materially breached its extensive contractual representations and warranties to RFC by delivering loans that were not originated or underwritten in accordance with the requirements of the Agreement; did not meet the representations and warranties made as to those loans; and/or failed to comply with applicable state and federal law.

41. Using an AVM, the Trust investigated Defendant's representations and warranties about the appraised values of properties backing some of the loans (the "Forensic Review"). Sufficient data existed to conduct this Forensic Review as to 871 loans Defendant sold to RFC that were subsequently securitized and experienced losses or which are expected to experience losses. Because the Forensic Review examines information outside of a loan file, it can sometimes identify breaches that are not identified in a loan reunderwriting (likewise, for the reasons discussed below, reunderwriting can sometimes identify breaches that are not identified via Forensic Review).

42. AVM is a tool in the mortgage industry that considers objective criteria, such as the sale prices of comparable properties, previous surveyor valuations, historical house price movements, and user inputs (number of bedrooms, property improvements, etc.), in the same locale as the subject property to determine the true market value of the property in question at a specific point in time.

43.     Using the same comparable sales data that would have been available to Defendant at the time of origination, the Forensic Review conducted retroactive appraisals of the properties backing 871 loans Defendant sold to RFC that were included in RMBS trusts for which liabilities were settled in the bankruptcy, have experienced losses or are expected to experience losses, and for which comparable sales data was available.  The Forensic Review centered on three of Defendant's core appraisal-related representations:  (i) the market value of the mortgaged premises is at least equal to the appraised value stated in the loan application (Client Guide A202(T)); (ii) no fraud or misrepresentation by the appraiser occurred in the origination of the loans and all information and documents provided to RFC in connection with the loans are complete and accurate (Client Guide A202(KK) and MLPSA 3.3(tt)); and (iii) all data provided by Defendant to RFC relating to any loan is true and complete (Client Guide A202(A) and MLPSA 3.3(a)).

44.     For loans where sufficient comparison data was available, among other findings, the Forensic Review concluded that Defendant had made the following misrepresentations concerning property values for loans it sold to RFC:

- 31.2% had reported property values overrepresented by more than 10%;

- 26.2%  had reported property values overrepresented by more than 15%;

- 30.1% had reported loan-to-value ("LTV")[22] ratios underrepresented by more than 10%;

---

[22] The LTV ratio is a key measure of a borrower's likelihood to default.  The LTV ratio expresses the amount of the mortgage loan as a percentage of the appraised value of the property.  For example, if a borrower borrows $80,000 to buy a house worth $100,000,

- 23.2% had reported LTV ratios underrepresented by more than 15%;

- 10.4% had reported LTV ratios underrepresented by more than 25%; and

- 30.4% of the loans had actual LTV ratios greater than 100% (i.e., the loans were "underwater" at origination).

45.     All of these findings establish breaches of at least the following representations Defendant made to RFC: (A), (T), and (KK) of Section A202 of the Client Guide and (a) and (tt) of Section 3.3 of the MLPSA, which provide that (a) all information delivered to RFC with respect to each loan was true, correct, and accurate; (b) the fair market value of the property was greater than the appraised value; and (c) there was no fraud or misrepresentation on the part of any appraiser.

46.     In total, the Forensic Review demonstrated that 31.9% of the loans reviewed contained at least one defect.   A schedule identifying the defective loans discovered by the Forensic Review, and the findings connected with those loans, is attached as Exhibit A.   The Forensic Review demonstrates that defects are pervasive throughout the pool of loans Defendant sold to RFC.

47.     Because an AVM analysis examines only property value–related representations for a given loan, it is not uncommon for an AVM analysis to provide a

---

then the LTV ratio is $80,000/$100,000, or 80%—the remaining $20,000 of the house's value reflects the borrower's 20% equity stake in the house.   A combined-loan-to-value ratio (or "CLTV" ratio) expresses the amount of all of the loans secured by a property as a percentage of the appraised value; that is, it accounts for any additional liens.   The Forensic Rreview used CLTV in analyzing second-lien loans.   A borrower with a sizable equity stake in a property has more to lose than a borrower with a small stake.   Thus, a borrower with a large equity position has financial incentives not to default and lose his or her equity.   Conversely, a borrower with little or no equity stake in a property has little financial incentive to avoid default.

lower breach rate for a group of loans than a reunderwriting review of a sample of loans from that population. This is because the reunderwriting review covers the full scope of loan-level representations and warranties—such as those dealing with income, employment status, and credit history—instead of just the property value-related representations examined in an AVM review. In certain cases, an AVM analysis may find a higher breach rate than a reunderwriting review because an AVM uses external information to detect misrepresentations regarding value, which may not be detectable from just reviewing the materials in a loan file.

48.     Apart from the Forensic Review, internal reviews conducted by RFC determined that many of the loans Defendant sold violated the Client Guide and/or other representations or warranties made by Defendant in various other ways, resulting in Events of Default under the Agreement.

49.     The types of defects varied, but included income misrepresentation (a violation of Client Guide A202(A), (G), (KK)), employment misrepresentation (a violation of Client Guide A202(A), (G), (T)), undisclosed debt (a violation of Client Guide A202(KK)), and missing or inaccurate documents (a violation of Client Guide A202(D), (T)), among others. These defects demonstrate that additional material defects exist throughout the loan population sold to RFC by Defendant. Indeed, a number of the loans defaulted very shortly after origination (constituting Early Payment Defaults or EPDs), which is widely recognized in the industry as often signaling fraud or other problems in the origination and underwriting of the loans.

50.     By way of example, RFC identified the following defects in loans sold by Defendant which were later securitized:

a.  Example: Loan ID # 7930541—(included in securitization RAMP 2002-RZ4) in the amount of $122,550, with a funding date of August 26, 2002. The borrower's income was not calculated correctly, in part because the reported income did not take into account the fact that the borrower owed various debts. With the correct income calculation, and taking the unpaid debts into account, the debt-to-income ratio ("DTI") increased to an unacceptable 65.9%, well over the program's maximum permitted DTI of 50%. The significant increase in the DTI meant this loan was riskier than represented by Defendant, because the borrower had significantly less ability to service the loan than represented. This misrepresentation breached the Client Guide, including, without limitation, section A202(MM) of the July 1, 2002 RFC Client Guide, No Fraud or Misrepresentation. Defendant acknowledged the problems with this loan and repurchased it.

b.  Example: Loan ID # 8330594—(included in securitization RFMSII 2002-HI5) in the amount of $29,000, with a funding date of October 30, 2002. The borrower on this loan was terminated from his employment before the loan was funded. Due to this gap in employment between the date he was terminated and the date when the loan was funded, the DTI increased to an impermissible 67%. The gap in employment jeopardized the borrower's ability to make the required payments. In addition, it is commonly understood in the industry that a higher DTI makes a loan riskier, because the borrower had significantly less ability to service the loan than represented. This misrepresentation breached the Client Guide, including, without limitation, section A202(MM) of the October 1, 2002 RFC Client Guide, No Fraud or Misrepresentation.

c.  Example: Loan ID # 7569341—(included in securitization RFMSII2002-HI3) in the amount of $19,300, with a funding date of May 3, 2002. The borrower on this loan failed to disclose certain debts and did not provide required documentary support of her income. Even if the stated income was correct, with the undisclosed debt, the DTI increased to an impermissible 68%. The high DTI meant this loan was riskier than represented by Defendant, because the borrower had significantly less ability to service the loan than represented. This misrepresentation breached the Client Guide, including, without limitation, section A202(MM) of the January 1, 2002 RFC Client

Guide, No Fraud or Misrepresentation. Defendant acknowledged the problems with this loan and repurchased it.

d.  Example: Loan ID # 6857558—(included in securitization RFMSII 2002-HI2) in the amount of $40,700, with a funding date of December 14, 2001. The borrower on this loan had a DTI of 59.84%, which exceeded the program maximum. Further, the first mortgage did not meet the necessary seasoning requirement, as the borrower completed an equity refinance the same day as he obtained the loan. A high DTI and the undisclosed refinancing made the loan riskier than Defendant initially represented. This misrepresentation breached the Client Guide, including, without limitation, section A202(NN) of the October 1, 2001 RFC Client Guide, No Fraud or Misrepresentation.

e.  Example: Loan ID # 8508034—(included in securitization RASC 2003-KS8) in the amount of $180,900, with a funding date of September 4, 2003. The borrower on this loan grossly overstated her monthly income by more than $2800 per month. The borrower also failed to disclose an existing mortgage. As a result of these two defects, the DTI on the loan increased to 114%, in violation of the program. Due to the skyrocketing increase in the DTI, the loan was much riskier than Defendant represented and the borrower would have had great difficulty servicing the loan. This misrepresentation breached the Client Guide, including, without limitation, section A202(LL) of the July 1, 2003 RFC Client Guide, No Fraud or Misrepresentation. Defendant acknowledged the problems with this loan and indemnified RFC in full.

The above examples are not intended to be an exhaustive list of the loans sold by Defendant to RFC that contained material breaches of representations and warranties. Rather, these loans represent a sample of the defects found in the loans Defendant sold to RFC. Many more of the loans sold to RFC by Defendant contained material defects that violated the representations and warranties it made in the Agreement.

51.  On the basis of the foregoing, and pursuant to section A209 of the Client Guide, Plaintiff has determined that at least the loans referenced in paragraph 50 above, and on Exhibit A hereto, contain defects and were sold by Defendant to RFC in violation

of the Agreement. Plaintiff hereby declares an Event of Default under the Client Guide based on those breaches for any loan that has not been repurchased or fully satisfied. Additional material defects are likely contained throughout the loan population sold to RFC by Defendant.

**RFC's Liabilities and Losses Stemming from Defendant's Breaches.**

52.     As a direct result of Defendant's breaches, RFC has incurred obligations, liabilities, damages, and losses for which it is entitled to recovery from Defendant.

53.     First, RFC has incurred billions of dollars in liabilities and losses stemming from defective loans, including loans sold to RFC by Defendant.

54.     In addition, RFC has expended tens of millions of dollars litigating the quality of the loans sold to it by Defendant and others in extensive federal and state court litigation in which the plaintiffs claimed the loans were rife with borrower or originator fraud, or failed to comply with applicable state and/or federal law.

55.     Specifically, beginning in 2008 and continuing until RFC filed for bankruptcy protection with the Bankruptcy Court on May 14, 2012, RFC faced a growing number of claims and dozens of lawsuits stemming from the defective loans sold to it by Defendant and other correspondents.

56.     For example, a number of the RFC-sponsored RMBS offerings containing loans sold to RFC by Defendant became the subject of more than a dozen lawsuits brought by investors and other participants in the securitizations. The plaintiffs alleged that as many as 88% of the loans contained in the at-issue RMBS offerings were defective in one or more ways.

57.     The first of these lawsuits was filed by bond insurer MBIA Insurance Corporation ("MBIA") in October 2008.   The MBIA lawsuit covered five RFC-sponsored second-lien securitizations that included thousands of mortgage loans.  For the first time, RFC learned that MBIA's analysis had concluded that over 80% of the loans in the pools it insured were defective.

58.     The MBIA lawsuit was followed shortly thereafter by a class action suit filed by the New Jersey Carpenters pension funds. This lawsuit purported to cover 59 mortgage-backed securities offerings issued through RFC's "RALI" shelf in 2006 and 2007, which consisted of first-lien Alt-A loans.  These securitizations were identified by names that included the letters "QA," "QH," "QO," and "QS."  As shown in Exhibit D, over 20 loans sold by Defendant were included in the offerings that were the subject of the New Jersey Carpenters' lawsuit.

59.     The New Jersey Carpenters complaint alleged that 38% of the mortgage loans underlying the securitizations were in delinquency, default, foreclosure or repossession when the complaint was filed, and that much of RFC's mortgage loan data "was inaccurate due to the inflated appraisal values, inaccurate LTV ratios, borrower income inflation, and the other facets of defective underwriting" described throughout the complaint.  NJ Carpenters First Am. Compl. ¶¶ 9, 110, in *New Jersey Carpenters, et al. v. Residential Capital, LLC, et al.*, Case No. 08-cv-08781 (HB) (S.D.N.Y.).  Of course, that data was provided to RFC—and represented and warranted to be accurate—by Defendant and other correspondent lenders.

60.     On February 18, 2011, the Allstate Insurance Company and its various subsidiaries and affiliates ("Allstate") sued RFC and numerous other parties in Hennepin County District Court, Minnesota.  Allstate sued RFC for its role in 23 securitizations, six of which included in the aggregate over 170 loans sold to RFC by Defendant.  Allstate supported the allegations in its complaint with a forensic review of over 30,000 loans to determine owner-occupancy status and property valuations.   For each of the six securitizations that contained loans sold by Defendant, Allstate reviewed a sample of 800 defaulted loans and 800 loans tested at random, unless a particular securitization contained less than 800 loans—in which case, Allstate reviewed all of the loans in that securitization.   Allstate alleged that its review of these loans showed significant misstatements concerning owner-occupancy rates and LTV ratios, both of which Defendant was responsible for reviewing under the Client Guide.

61.     In the fall of 2011, bond insurer Financial Guaranty Insurance Corporation ("FGIC") started filing lawsuits against the Debtors related to securitizations it had underwritten.  On November 29, 2011, FGIC filed an action against RFC and other parties, asserting claims relating to the RFMSII 2005-HS1 and RFMSII 2005-HS2 securitizations, which in aggregate contained over 140 loans sold by Defendant to RFC. FGIC supported the allegations in its complaint with, among other things, the results of a review of the owner-occupancy rates and LTV ratio representations for the securitizations, which FGIC obtained by reviewing over 18,000 loans using an automated-valuation-tool.  This review found significant misstatements with respect to the representations in the transaction documents concerning owner-occupancy and LTV

ratios. RFC would have made these representations in reliance on Defendant and other correspondents providing it truthful information concerning the loans.

62. On December 27, 2011, FGIC filed an action against RFC and other parties, asserting claims relating to the RFMSII 2005-HSA1, RFMSII 2006-HSA1, and RFMSII 2006-HSA2 securitizations, which contained one loan sold by Defendant to RFC. FGIC supported its allegations in this case with a forensic reunderwriting of certain loan files it was able to obtain. According to the complaint, FGIC's consultant found breaches in approximately 69% of the RFMSII 2005-HSA1, 60% of the RFMSII 2006-HSA1, and 59% of the RFMSII 2006-HSA2 loan files that were reviewed. FGIC also supported its allegations with the results of a review of the owner-occupancy rates and LTV representations in the securitizations, which FGIC obtained by reviewing over 11,000 loans using an automated-valuation tool. This review found significant misstatements with respect to the representations in the transaction documents concerning owner-occupancy and LTV ratios. RFC made these representations in reliance on Defendant and other correspondents providing it truthful information concerning the loans.

63. Numerous other lawsuits followed on until RFC's bankruptcy filing in 2012, including over 15 lawsuits brought by private investors in its RMBS securities, and more than a dozen lawsuits brought by monoline insurers.

64. All of these lawsuits alleged that the loans RFC sold into RMBS securitizations were defective in a variety of ways, including because of borrower fraud, missing or inaccurate documentation, fraudulent or inflated appraisals, misrepresentations

concerning owner-occupancy rates, or failure to comply with applicable state and federal law. Collectively, these lawsuits involved more than 100 RMBS securitizations and loans with a combined original principal balance of more than $100 billion. Across the dozens of securitizations involved in these lawsuits, Defendant was responsible for over 340 of the loans.

65.     As of May 2012, RFC had already repurchased millions of dollars worth of defective loans from its RMBS securitizations and whole loan purchasers, either at the request of a bond insurer, trustee or whole loan purchaser, or because RFC itself discovered a defect and affirmatively took steps to repurchase the loan. As described in more detail above, these included numerous loans sold to RFC by Defendant.

66.     In May 2012, the Debtors—partly because of the enormous exposure stemming from the pending mortgage-related lawsuits described above—filed for chapter 11 bankruptcy protection in the Bankruptcy Court for the Southern District of New York.

67.     In connection with the bankruptcy proceeding, hundreds of proofs of claim were filed by investors in RMBS, monoline insurers, whole loan purchasers, indenture trustees, and an array of co-defendants in the above-described loan-related litigation. These proofs of claim, many of which mirrored the litigation filed prior to the bankruptcy, sought damages in the tens of billions of dollars, all stemming from allegedly defective mortgage loans, including those sold to RFC by Defendant. By way of example, the following represents a small sampling of the hundreds of proofs of claim filed on the basis of defective loans:

a. The indenture trustees for each of the RFC-sponsored securitizations (Deutsche Bank, Bank of New York, U.S. Bank, HSBC Bank, Law Trust, and Wells Fargo) collectively filed more than two dozen proofs of claim at the direction of two substantial groups of institutional investors. The institutional investors collectively asserted that loan-level defects (including in the loans sold to RFC by Defendant and which RFC later securitized) triggered more than $19.5 billion in repurchase obligations.

b. AIG Securities Lending Corporation, an investor in 33 Debtor-sponsored securitizations, filed five proofs of claim, totaling over $2.6 billion, based on the allegation that the loans were defective. The proofs of claim were based in part on analyses of the individual loan-level data for these loans.

c. Allstate, an investor in 23 Debtor-sponsored securitizations (a number of which included Defendant loans), filed 20 proofs of claim, based on the allegation that the loans were defective. The proofs of claim were based in part on analyses of the individual loan-level data for these loans.

d. John Hancock Life Insurance Company and its various subsidiaries and affiliates, investors in 52 Debtor-sponsored securitizations, filed 43 proofs of claim, asserting similar allegations.

e. Prudential Trust Company and its various subsidiaries and affiliates, investors in 28 Debtor-sponsored securitizations, filed 31 proofs of claim, asserting similar allegations.

f. FGIC, a monoline insurer that issued financial guaranty insurance on a number of RFC-sponsored securitizations that included Defendant loans, filed three proofs of claim seeking approximately $1.85 billion in damages based on alleged defects contained in the loans, a number of which FGIC had individually reviewed.

68. Many whole loan purchasers also filed proofs of claim in the bankruptcy proceedings, collectively seeking millions of dollars in recovery.

69. These proofs of claim, lawsuits, and demands all alleged, among other things, that the securitized or purchased loans were defective, improperly underwritten, and breached representations and warranties made by RFC to investors, purchasers, and other contractual parties. Those representations and warranties were made based on the

representations and warranties that RFC had received from Defendant, and on which RFC had relied. In many instances, creditors asserted claims against both RFC and against other Debtors based on the same losses.

70.     The Debtors initially proposed to settle portions of their RMBS-related liabilities for an aggregate $8.7 billion allowed claim in the bankruptcy cases. Subsequently, after protracted litigation over the reasonableness and propriety of that settlement, the Bankruptcy Court appointed the Hon. James M. Peck, then a United States Bankruptcy Judge for the Southern District of New York, to serve as a mediator and to attempt to achieve a negotiated resolution of the Debtors' RMBS-related liabilities and of other disputed issues in the chapter 11 cases. A lengthy mediation process ensued, which together with related proceedings, resulted in a global settlement that, among other things, provided for the resolution of *all* of the Debtors' RMBS-related liabilities for more than $10 billion in allowed claims granted to the various RMBS trusts, monoline insurers, Federal Housing Finance Agency, investors, and others.

71.     The manner in which multi-Debtor claims were settled varied: (a) Article IV.C.3 of the Plan, together with Schedules 2-R and 3-R thereto, allow RMBS trustee claims, and allocate these claims on an RMBS-by-RMBS basis; (b) Article IV.D of the Plan allows monoline insurer claims, but on a basis and in a manner that is different from RMBS trustee claims; and (c) the largest securities claims were resolved through a separate settlement trust or a single cash payment. Each of these settlements involved claims being asserted against RFC based on defective loans sold to it by Defendant and other correspondents.

72.     The Bankruptcy Court for the Southern District of New York ultimately approved the global settlement—including the $10 billion-plus settlement of RMBS-related liabilities—finding them to be fair and reasonable and in the best interests of each of the Debtors, and confirmed the Plan.  (*See* Findings of Fact ¶¶ 98-176, Case No. 12-12020-MG (Bankr. S.D.N.Y.) [D.I. 6066]).  The Plan became effective on December 17, 2013.

73.     Pursuant to its express contractual obligations, Defendant is obligated to compensate RFC for the portion of the global settlement associated with its breaches of representations and warranties, as well as for the portion of RFC's other liabilities and losses (including the tens of millions of dollars that RFC has paid in attorneys' fees to defend against, negotiate, and ultimately settle claims relating to allegedly defective loans) associated with those breaches.  Under the Plan, the Trust has succeeded to RFC's rights to assert these claims.

## COUNT ONE
## (BREACH OF CONTRACT)

74.     Plaintiff realleges each and every allegation set forth in Paragraphs 1 through 73, above, as if fully rewritten herein.

75.     RFC and Defendant entered into a valid and enforceable Agreement pursuant to which RFC acquired over 14,440 mortgage loans from First Tennessee that were later securitized.

76. Pursuant to the parties' Agreement, Defendant made representations and warranties to RFC regarding the quality and characteristics of the mortgage loans Defendant sold to RFC.

77. RFC complied with all conditions precedent, if any, and all of its obligations under the Agreement.

78. Defendant materially breached its representations and warranties to RFC inasmuch as the mortgage loans materially did not comply with the representations and warranties.

79. Defendant's material breaches constitute Events of Default under the Agreement.

80. RFC has suffered loss, harm, and financial exposure directly attributable to Defendant's material breaches, including liabilities and losses stemming from the defective loans, as well as attorneys' fees, litigation-related expenses, and other costs associated with both defending dozens of lawsuits and proofs of claim filed against it stemming in part from materially defective loans sold by Defendant, and fees and costs incurred in prosecuting this action.

81. Under the Plan, Plaintiff has succeeded to RFC's rights against Defendant under the Agreement.

82. Accordingly, Plaintiff is entitled to compensation in an amount to be proven at trial, which exceeds $75,000, together with an award of attorneys' fees, interest, and costs.

## COUNT TWO
## (INDEMNIFICATION)

83.     Plaintiff realleges each and every allegation set forth in Paragraphs 1 through 82 above, as if fully rewritten herein.

84.     RFC has incurred substantial liabilities, losses, and damages arising from and relating to material defects in the mortgage loans Defendant sold to RFC and Defendant's alleged breaches of representations and warranties made to RFC, including over $10 billion in allowed claims approved by the United States Bankruptcy Court for the Southern District of New York, as well as tens of millions of dollars in attorneys' fees, litigation-related expenses, and other costs associated with defending dozens of lawsuits and proofs of claim filed against RFC stemming in part from materially defective loans sold to RFC by Defendant.

85.     Defendant expressly agreed to indemnify RFC for the liabilities, losses, and damages, including attorneys' fees and costs, which RFC has incurred.

86.     Under the Plan, Plaintiff has succeeded to RFC's rights against Defendant under the Agreement.

87.     Accordingly, Plaintiff is entitled to indemnification in excess of $75,000 and in an amount to be proven at trial, and an award of attorneys' fees, interest, and costs.

WHEREFORE, Plaintiff demands judgment in its favor and against Defendant as follows:

(A)  On Count One (Breach of Contract), contractual repurchase compensation and/or damages in excess of $75,000 and in an amount to be proven at trial, and an award of attorneys' fees, interest and costs; and

(B)  On Count Two (Indemnification), a declaratory judgment that Defendant is responsible to indemnify Plaintiff against liabilities, losses, expenses and/or other damages paid or to be paid by RFC or Plaintiff in settlements, or otherwise stemming from Defendant's conduct; an order for damages sufficient to reimburse Plaintiff for the liabilities, losses, costs and expenses caused by Defendant's actions in excess of $75,000 and in an amount to be proven at trial; and an award of attorneys' fees, interest and costs; and

(C)  All such further relief, as the Court deems necessary or proper.

Dated:  January 23, 2017

By:  /s/ Donald G. Heeman
Donald G.  Heeman, #286023
Jessica J.  Nelson, #347358
Richard R. Voelbel, #0387091
220 South Sixth Street, Suite 2200
Minneapolis, MN  55402-4504
Telephone:  (612) 339-6321
Facsimile:  (612) 338-0535
dheeman@felhaber.com
jnelson@felhaber.com
rvoelbel@felhaber.com

QUINN EMANUEL URQUHART
& SULLIVAN, LLP
Peter E. Calamari (*pro hac vice* pending)
David Elsberg (*pro hac vice* pending)
Isaac Nesser (*pro hac vice* pending)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
PeterCalamari@quinnemanuel.com
DavidElsberg@quinnemanuel.com
IsaacNesser@quinnemanuel.com

Anthony P. Alden (*pro hac vice* pending)
Johanna Ong (*pro hac vice* pending)
865 Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100
AnthonyAlden@quinnemanuel.com
JohannaOng@quinnemanuel.com

CARPENTER LIPPS & LELAND LLP
Jeffrey A. Lipps (*pro hac vice* pending)
Jennifer A.L. Battle (*pro hac vice* pending)
280 Plaza, Suite 1300
280 North High Street
Columbus, Ohio 43215
Telephone: (614) 365-4100
Facsimile: (614) 365-9145
lipps@CarpenterLipps.com
battle@CarpenterLipps.com

*Attorneys for Plaintiff ResCap Liquidating Trust*